# United States District Court
# Northern District of Indiana
# Hammond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:08-CR- 22 JVB |
| | ) | |
| LAMAR SANDERS and | ) | |
| RALPHAEL SCOTT | ) | |

**OPINION AND ORDER**

This case is before the Court on motions to suppress identifications filed by each Defendant. The Court conducted an evidentiary hearing in four installments on January 12, March 10, March 31, and May 4, 2009. Each Defendant filed a supplementary brief following the hearing, to which the Government has responded. Reply briefs were due on August 20, 2009, but none has been filed. Accordingly, the motions are ripe for decision.

**A. Facts**

**1.** *The Crime*

Around 8:30 am on January 5, 2008, two men, one dressed in black and the other in a browning jogging suit, stopped Tamika Nobles and her ten-year-old daughter, R. E., as they were leaving their Portage, Indiana, apartment and forced them back into the apartment at gunpoint. The men told Nobles to drive to her mother's currency exchange at 212 E. 83rd Street (between Prairie and Indiana Avenues) in Chicago, to collect the exchange's cash, and to put it in her vehicle. The men kept R. E. with them and Nobles left for the currency exchange. The man dressed in brown led R. E. to a blue truck parked outside the apartment. He had her put an

ear warmer headband over her glasses. She could see a little despite the eye covering; it did not fit tightly because of her glasses. The man in brown drove her to Chicago, following behind the car driven by the man in black. She was in the truck with the man in brown for at least thirty minutes.

Meanwhile, Nobles phoned her mother, Ruby Evans, from a gas station en route to the currency exchange. Evans got in touch with Gregory Harrington, one of the security guards she employed, as well as the Chicago police. Harrington called David Haywood, a second security guard Ms. Evans employed, and told Haywood to look out for Nobles because her daughter had been kidnaped and Nobles had been instructed to put currency exchange money in her car. When Nobles arrived at the currency exchange she met Haywood, who was parked on 83rd street near the front of the currency exchange. He escorted her into the building, as he customarily did. He then moved his car from in front of the currency exchange to Indiana Avenue (the north-south street to the west of the currency exchange), facing northward, a few parking spaces south of 83rd Street. He observed a man dressed in black near his car for about ten minutes. He was waiting in hopes that the man would lead him to his car.

Harrington was also in his car on the same side of Indiana Avenue, facing north, at the intersection of 83rd and Indiana, a few parking spaces in front of Haywood's car. He saw a black man pacing near his car, talking on a cell phone. Harrington saw Nobles put a black plastic bag in her car and run back into the currency exchange. He then saw the man walk to Nobles' car and remove the black plastic bag. The man walked back to a spot near Harrington's car. When a Chicago Police Department squad car pulled up and parked on 83rd Street, a few doors away on the opposite side of the street from the currency exchange, Harrington saw the man with the

2

plastic bag remove his hat, gloves, and jacket and drop them to the ground.  Harrington got the attention of the police officer who had emerged from the squad car and explained the situation briefly.  Harrington and Haywood chased the man on foot.  Harrington pulled his gun on the man and ordered him to stop as the CPD officer approached in his squad car.  Chicago Police Sargeant Michael Davis, the officer in the squad car, got out of the car, ordered the man to the ground and pulled out his weapon. The man, later identified as Defendant Ralphael Scott, was arrested and taken to the Area Two Chicago police headquarters.

R. E. was let out of the truck around the corner from the currency exchange in time to see her mother put something in her car and a man take something out of the car.

Defendant Lamar Sanders surrendered to Indiana authorities on January 10, 2008.

## 2. *The Challenged Identifications*

**(a)** *Tamika Nobles' and R. E.'s Identifications of Lamar Sanders*[1]

After Defendant Scott was taken into custody, Chicago police officers seized and towed a tan Dodge Magnum registered to Defendant Lamar Sanders that they found near the currency exchange.  They were drawn to the car because when Defendant Scott was arrested, he had a keyless entry device that made the car beep. In the car the police found several photographs, at least one of which they showed to Nobles while she was still at the currency exchange.  She identified an image of Defendant Sanders in one of the photos as looking like one of the men who had come to her apartment.  Nobles testified at the hearing that she could not identify

---

[1] In his initial motion Defendant Sanders challenged Ruby Evans's identification of him from a photo array. However, he presented no evidence at the hearing and made no argument in his memoranda from which the Court can conclude that the procedure used was unnecessarily suggestive with respect to her, and has apparently abandoned any attempt to have her identification of him suppressed.

Sanders in a second photo, but Edmund Beasley, one of the officers who was present, testified that she was shown only one photo. R. E. was not shown the photos taken from the Dodge at the scene.

Nobles testified at the hearing that several hours later on the date of the incident, at Area Two headquarters, in the presence of an F.B.I. agent, she viewed two photo arrays, each with photos of six men. Both included one photo of Defendant Sanders, but not the same photo in each array. Nobles told the agent that the photo of Sanders in each array looked like one of the men who had been at her house.

At Area Two headquarters, R. E. also picked Sanders from a photo array. She too testified that she had been shown two photo arrays. F.B.I. Agent Robert Hall testified that R. E. selected Sanders from the photo array immediately and was definite that this was the person who had driven her to Chicago.

According to Nobles, she and R. E. traveled from the currency exchange to Area Two headquarters in separate vehicles; R. E. testified that she went to the police station in the same car with her mother and grandmother. Nobles remembers the man in black as the taller of the two men, while R. E. testified that the man in the brown jogging suit was the taller. Information on the back of the photo arrays include the height of the two men: Sanders is 5' 10 and Scott is 5"8".

Nobles stated at the hearing that the men were at her apartment for about twenty minutes. R. E. estimated the time at about thirty minutes. Nobles did not see the face of the man in black, but she did see the man in brown. Before identifying Sanders in the six-person photo arrays, Nobles had described the man in brown to a Chicago police officer as being a medium

4

complected black male about five feet five inches tall, weighing 250 pounds, the shorter of the two men.[2] R. E. testified that she told the police the man in the brown jogging suit was a black man with hair on his head and a mustache. She also testified that neither his face nor hers was covered while he was in their apartment.

F.B.I. Agent Robert Hall testified that no witness was in the presence of any other witness when they made their identifications from the photo arrays. Each of the identification witnesses also testified that he or she was not in the presence of any other identification witness during the photo array procedure.

Defendant Sanders is five feet ten inches tall and weighed 185 to 190 pounds when the photographs used in the arrays were taken. In the picture used in the photo array, he has a mustache.

**(b)** *R. E. Ellis's Identifications of Ralphael Scott*

After Defendant Scott was arrested following the chase, he was handcuffed and placed in a police car. He was driven back to the currency exchange, where he was moved to a waiting police van. Nobles and R. E. were standing together while they observed the transfer from the police car to the van. A police officer asked Nobles if Scott was the man who had been at her apartment. She was not able to identify him, but R. E. said "That's him. He was in our house." At the hearing R. E.'s testimony as to her opportunity to observe the man dressed in black was inconsistent. She said that she saw his face while he was at her house for about five seconds, but

---

[2]The testimony at the hearing did not establish whether Ms. Nobles provided the description before or after she viewed the photos found in the Dodge. Also, according to the hearing transcript, at one point she said he weighed 155 pounds and at another she said his weight was 250 pounds, but to the best of the Court's recollection, this disparity is the result of a typographical error in the transcript rather than a change in testimony.

later agreed that she never saw his face or that she did not remember whether or not she could see his face. Still later she stated that she had seen his face. Nobles told law enforcement that R. E. had a better opportunity to observe the man in black than she did.

**(c)** *Haywood's and Harrington's Identifications of Scott*

At the hearing Haywood testified that he had observed a black man wearing a black hooded sweat shirt and black pants for about ten minutes standing and walking near his car, talking on a cell phone and carrying a black plastic bag. When he and Harrington got out of their cars to approach the man he ran. Haywood estimated that the chase lasted for ten minutes during which he lost sight of the man in black for a second. After the chase ended with the man's apprehension, Haywood saw the man in hand cuffs seated in a squad car. He identified him as the man he had seen near his car and the man he had chased. The man was Defendant Scott. Later, at Area Two headquarters, Haywood identified Scott's likeness from a six-man photo array as the man he had seen near the currency exchange.

Harrington was able to observe the man he saw take the bag out of Nobles' car for about fifteen minutes before he participated in the chase that led to his arrest. At the scene he identified the man who was taken into custody as the same man he had seen near his car, the one who had taken the bag from Noble's car, and the one he had chased. Later, at Area Two headquarters he picked Defendant Scott's photograph from a six-man photo array as the man he had seen, chased, and helped to apprehend near the currency exchange.

**B. Legal Standard**

6

A criminal defendant has a due process right not to be identified before trial in a manner that is unnecessarily suggestive and conducive to irreparable mistaken identification. *United States v. Rogers*, 387 F.3d 925, 936 (7th Cir. 2004) (citations and quotations omitted). A court must conduct a two-step analysis to determine whether an identification procedure comports with due process. First, the defendant must demonstrate that the procedures were unduly suggestive. Then the court asks whether, under the totality of the circumstances, the identification was reliable despite the suggestive procedures. *Id.* These two inquiries are separate and are to be addressed sequentially. *McGowan v. Miller*, 109 F.3d 1168, 1173 (7th Cir. 1997).

Showup identifications, where law enforcement officers show only one suspect to the witness, whether by means of a photograph or in person, have been widely condemned. *United States v. Funches*, 84 F.3d 249, 253 (7th Cir. 1996). However, a showup identification may be proper and not unduly suggestive under some circumstances. *United States v. Sleet*, 54 F. 3d 303, 309 (7th Cir. 1995) (citations and quotations omitted). For example, immediate showups may serve the legitimate law-enforcement purpose of allowing identification before the suspect has altered his appearance and while the witness's memory is fresh, and may permit the quick release of innocent persons. *Id.*

To establish that an identification procedure was unduly suggestive, the defendant must show both that the identification procedure was suggestive and that such suggestiveness was unnecessary. *United States v. Hawkins*, 499 F.3d 703, 707 (7th Cir. 2007). While a showup identification is inherently suggestive, it will not be considered unnecessarily so if there was a good reason for not using a less suggestive alternative. *Id.* A showup identification is not

unduly suggestive in cases of extraordinary urgency, such as a situation in which police seek to confirm that an individual apprehended shortly after the commission of a crime and in close proximity to the scene is, in fact, the suspected perpetrator. A showup under such circumstances allows identification while the witness's memory is still fresh and protects innocent people from arrest while enabling authorities to determine whether they must continue to search. *Id.* at 707–8.

If the court finds that an identification is unduly suggestive, it must then consider whether the identification presents sufficient indicia of reliability despite the possibility of suggestiveness. The court must consider the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. *Manson v. Brathwaite*, 342 U.S. 98, 114 (1977).

**C. Discussion**

**1. The Identifications of Sanders**

Applying the foregoing principles to Nobles' identification of Sanders, the Court concludes that neither the identification procedures using the photos found in the vehicle near the scene nor the procedures used in the later photo arrays were unduly suggestive. The fact that the keys found on Scott opened the car raised the question of whether the persons in the photographs found ins the car were tied to the crime. The police had a legitimate law enforcement objective of determining immediately if they should search for the person in those

8

photos as the other suspect. Nobles' identification of Sanders as one of the men who had been at her apartment let them know that they were on the right track.

Sanders claims the later photo arrays Noble viewed were unduly suggestive with respect to Nobles because she had already viewed photos of Sanders at the scene, and she was shown two photo arrays with two different pictures of Sanders. The Court disagrees. First, the only evidence that Nobles actually viewed two photo arrays of Sanders was her testimony at the hearing more than a year after the identifications took place, despite the fact that Agent Hall, who showed the arrays to the witnesses, did not mention showing two different photo arrays of the same person to any witness.[3] Moreover, few details of how the two photo arrays were conducted came out in the hearing. According to Nobles, she was shown one array, identified Sanders as looking like one of the men who was at her apartment, and then did the same with another photo array containing a different picture of Sanders.

The Court is not convinced that Nobles was shown two photo arrays including Sanders, but even if she was, that fact, without more, does not compel the conclusion that the procedure was unduly suggestive. There is no evidence that she had difficulty selecting Sanders from either array or that she was shown the second array before being asked to make any identification, which might suggest that Agent Hall was hoping she would notice the common denominator and select the only man who appeared in both arrays. Showing Nobles a second array after she had identified Sanders in the first array was not suggestive, but merely

---

[3] It was established that two different photo arrays with different pictures of Sanders were generated. Government Exhibit Two is a photo array indicating that Nobles identified Sanders in a tan V-neck shirt. From Government Exhibit Three R. E. selected a picture of Sanders in a white top.

superfluous. The Court further finds nothing unduly suggestive in the photographs that were selected for the arrays. Sanders does not stand out in any way.

Furthermore, assuming that the procedure was unduly suggestive, considering the totality of the circumstances the Court finds that identification was reliable in any event. Nobles testified that the intruders were in her house for fifteen to twenty minutes. While she was not 100% certain that Sanders was one of the men, each time she was asked whether she saw anyone she recognized in a photo or photo array, she said the likeness of Sanders looked like one of the men who was in her house—the one in the brown jogging suit. The identifications took place within a few hours, at most, of the crime. Nobles candidly admitted both at the scene and at the hearing that she did not get a good enough look at the other intruder to be able to identify him. It is true that none of the witnesses gave a detailed description of the perpetrators before making their identifications, and Nobles' estimation of the height of the person she ultimately identified as Sanders was off by five inches, but this inaccuracy alone does not render her identification so unreliable that it offends due process. Accordingly, the Court will not suppress Nobles' identifications of Sanders.

R. E. identified Sanders from one or more photo arrays as the man who was in her apartment and the man who drove her to Chicago. She had an even longer opportunity to observe the man than her mother did, and she was not shown the photos from the car before she selected Sanders from a photo array. She also testified that she saw two arrays with Sanders depicted, but the Court has the same doubts about whether there were two arrays. Once again, knowing only that there may have been two arrays, with Sanders as the only person depicted twice, the Court is unable to conclude that the procedure was unduly suggestive. Even assuming

10

the suggestiveness of showing her two arrays depicting Sanders, the Court finds that under the totality of the circumstances, R. E.'s identification was reliable, given the length of time she had to observe the man in the brown jogging suit during the commission of the crime, the definiteness with which she made the identification, and the short period of time between her encounter with him and the identification.

**2. R. E.'s Identification of Scott**

The Court finds that the showup identification of Scott was not unduly suggestive. While displaying him to R. E. and her mother in handcuffs as he was being transferred from a squad car to a police van was suggestive, there was a good reason not to use a less suggestive alternative. The identification occurred immediately after the chase and arrest. Although Harrington and Haywood had confirmed that Scott was the man they had watched and chased, they had no knowledge of whether this man was one of the men who had been at Noble's apartment. Exhibiting Scott to R. E. immediately after the arrest allowed her the opportunity to make an identification before he could change his appearance and could have prevented a trip to the station if she had failed to recognize him. Accordingly, the Court will not suppress this identification.

**3. Haywood and Harrington's Identifications of Scott**

The Court is hard pressed to conclude that Haywood's and Harrington's identifications of Scott at or near the currency exchange on the morning of the crime can even be characterized as showup identifications. Both men participated in the pursuit of the man in black. At the end of

11

the chase they confirmed Scott as the man they had chased. In any case, the Court finds that their on-scene identifications were not unduly suggestive, because they served the same legitimate law enforcement objectives discussed earlier. Neither does the Court find undue suggestiveness in the fact that they were later that day asked to identify Scott in photo arrays. At worst, the second identifications were superfluous. As for the six photos in the array, the Court finds that the appearance of each was similar enough that Scott did not stand out from the others in a way that would suggest to the witnesses that he was the target. Moreover, the reliability of their identifications is independently established by the length of time they each had to view the suspect before the identifications, their certainty, and the short period of time between their initial observations and the identifications.

**D. Conclusion**

For the foregoing reasons, the Court DENIES Defendants' motions to suppress the challenged identifications (DE 47 and 63).

SO ORDERED on October 15, 2009.

s/ Joseph S. Van Bokkelen  
Joseph S. Van Bokkelen  
United States District Judge